[No. D058669. Fourth Dist., Div. One. Oct. 4, 2012.]

WANKE, INDUSTRIAL, COMMERCIAL, RESIDENTIAL, INC., Plaintiff and Appellant, v.
SCOTT KECK et al., Defendants and Appellants.

[No. D058825. Fourth Dist., Div. One. Oct. 4, 2012.]

WANKE, INDUSTRIAL, COMMERCIAL, RESIDENTIAL, INC.,
Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SCOTT KECK et al., Real Parties in Interest.

1152

1154

### COUNSEL

Lindborg & Mazor, Peter F. Lindborg, Irina J. Mazor and Patricia I. Forman for Plaintiff and Appellant and for Petitioner.

Page, Lobo, Costales & Preston, Jonathan Preston; Boudreau Williams and Jon R. Williams for Defendants and Appellants and for Real Parties in Interest.

No appearance for Respondent Superior Court.

### OPINION

### AARON, J.—

## I.

## INTRODUCTION

This case requires this court to answer two fundamental questions. First, may a party obtain appellate review of an order acquitting a defendant in a nonsummary criminal contempt proceeding? We conclude that the double jeopardy clause of the Fifth Amendment to the federal Constitution precludes such review. Second, may a party successfully defend against an alleged violation of a facially valid stipulated injunction that the trial court had jurisdiction to issue, on the ground that the injunction is invalid? We conclude that the answer to this question is "no."

Applying these conclusions in the present case, we deny Wanke, Industrial, Commercial, Residential, Inc.'s (Wanke) writ petition seeking review of an order acquitting Scott Keck and his company, WP Solutions, Inc. (WP

Solutions), of contempt for violating a stipulated injunction enjoining Keck and WP Solutions from soliciting certain Wanke customers. However, with respect to Wanke's related appeal from its motion to enforce a settlement agreement that incorporated the stipulated injunction, we conclude that the trial court erred in finding that the stipulated injunction is invalid and refusing to enforce the injunction on that basis.[1]

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *The parties*

Wanke is a company that installs waterproofing systems in Southern California. Scott Keck and Jacob Bozarth are former employees of Wanke.[2] While employed by Wanke, Keck and Bozarth signed certain confidentiality agreements as conditions of their employment. In early 2008, Keck and Bozarth left Wanke's employ and formed their own competing waterproofing company, WP Solutions.

B. *The underlying action for misappropriation of trade secrets*

In December 2008, Wanke filed the underlying action in this matter against Keck and Bozarth. Wanke's complaint alleged that it had "spent a significant amount of time, effort, and money in the acquisition, development, compilation and maintenance of confidential information concerning its customers, business, and products," including the "identity of [Wanke's] existing and prospective customers, the objectives of each customer, the strategies developed for each customer, the identities of key personnel at those customers, the special needs and characteristics of [Wanke's] existing and potential customers, [and] the histories and account balances of existing customers . . . collectively . . . 'Confidential Information' . . . ." Wanke further alleged that Keck and Bozarth had "misus[ed] and misappropriat[ed] . . . [Wanke's] trade secrets . . . including . . . some or all of the Confidential Information." Wanke also alleged that Keck and Bozarth had "actively targeted and recruited customers of [Wanke] utilizing the confidential business information of [Wanke] . . . ." Wanke's complaint contained eight causes of action, including a claim for misappropriation of trade secrets. In its prayer for relief, Wanke

---

[1] Keck and WP Solutions also have filed an appeal in this matter in which they raise two claims. However, for reasons discussed in the body of this opinion, both of the claims that Keck and WP Solutions raise fail in light of our resolution of Wanke's appeal.

[2] Bozarth is not a party to the proceedings in this court. In its writ petition, Wanke states that "Bozarth is currently a debtor under Chapter 13 of the United States Bankruptcy Code," and that "no relief is sought, individually, against him in this petition."

requested that the court issue "an order enjoining [Keck and Bozarth] from soliciting [Wanke's] past or current customers," in addition to seeking other forms of relief.

Keck and Bozarth filed a cross-complaint against Wanke for unpaid compensation.

In October 2009, the parties resolved the action by entering into a settlement and mutual general release agreement (Settlement Agreement).[3] Among the terms of the Settlement Agreement were that Keck, Bozarth, and WP Solutions would pay Wanke $38,000. In addition, the parties agreed to release each other from any existing or future claims. Keck, Bozarth, and WP Solutions also agreed to a stipulated injunction described in the following paragraph (Stipulated Injunction). The Settlement Agreement provided that the trial court would retain jurisdiction over the parties pursuant to Code of Civil Procedure section 664.6, to enforce the terms of the Settlement Agreement and the Stipulated Injunction.

On October 30, 2009, the trial court entered the Stipulated Injunction.[4] The Stipulated Injunction, which the parties agreed would remain in force for five years from the date of entry of the order, prohibited Keck, Bozarth and WP Solutions from: "Contacting or soliciting any person, entity, project owner, or representative on the customer list of [Wanke] attached hereto as Exhibit '1' ('[Wanke's] Customers')[5] for the purpose of gaining any of their business, provided that, after a period of eighteen (18) months from the date of entry of this order that defendants will not be deemed to have contacted or solicited a person or entity included within the definition of [Wanke's] Customers if such person or entity initiates the contact with defendants which leads to defendants submitting a bid or proposal to such person or entity."

The Stipulated Injunction also contains various other restrictions related to this provision, including prohibitions on "[s]eeking to redirect and/or redirecting business from [Wanke's] Customers to Defendants," and "[s]upplying labor, equipment, materials or services to any of [Wanke's] Customers." The Stipulated Injunction provides for liquidated damages in the amount of

---

[3] It appears from the Settlement Agreement that Wanke amended its complaint to name WP Solutions as an additional defendant prior to entering into the Settlement Agreement.

[4] The Stipulated Injunction was signed by Keck and Bozarth. Bozarth signed both as an individual and in his capacity as president of WP Solutions.

[5] The "Customer & Job List" that was attached to the Stipulated Injunction contained two different types of entries. Some entries listed the name of a Wanke customer (e.g., Con Am Management Corporation (Con Am Management)), while other entries listed the names of customers but were limited to a specific job or jobs that Wanke had performed for those customers (e.g., AV Builders: Saratoga West).

$50,000 "for the initial violation of any provision of this order, with the amount of such liquidated damages increasing in increments of [$10,000] for each subsequent violation of any provision of this order, plus [Wanke's] actual attorneys' fees, costs and expenses . . . ."

### C. Proceedings to enforce the Stipulated Injunction

#### 1. The Con Am Management proceedings

##### a. The order to show cause for contempt and motion to enforce the Settlement Agreement

In May 2010, Wanke filed an application for an order to show cause (OSC) requesting that the trial court hold Keck, Bozarth, and WP Solutions (defendants) in contempt for having violated the Stipulated Injunction. In its application, Wanke alleged that defendants had violated the terms of the Stipulated Injunction on 11 separate occasions by, among other things, contacting and/or supplying labor and/or materials to Con Am Management, one of Wanke's customers that appeared on the "Customer & Job List" attached to the Stipulated Injunction.

In June 2010, Wanke filed a motion to enforce the Settlement Agreement pursuant to Code of Civil Procedure section 664.6. In its motion and accompanying brief, Wanke referred to defendants' alleged violations of the Stipulated Injunction related to Con Am Management, and requested that the court order defendants to pay liquidated damages as provided in the Stipulated Injunction.

##### b. The contempt trial/hearing on motion to enforce the Settlement Agreement[6]

On August 9, 2010, the trial court held a combined trial on Wanke's OSC for contempt and hearing on Wanke's motion to enforce the Settlement Agreement. At that proceeding, Wanke presented evidence that Keck and WP

---

[6] Prior to the contempt trial, the trial court entered a stipulated order pertaining to the sequence in which it would adjudicate the OSC for contempt and the motion to enforce the Settlement Agreement. In the stipulation, the parties agreed that, in the interest of "judicial economy," they would "[a]dvance the hearing on the settlement motion to immediately after [the contempt] trial . . . should [Wanke] succeed in establishing at [the contempt] trial that the [Stipulated Injunction] has been violated and/or the Settlement Agreement breached." The parties further agreed that if the trial court were to "rule in favor of defendants at the time of [the] [contempt] trial, the hearing on the settlement motion shall be taken off calendar." In its statement of decision, the court referred to the proceedings as a "contempt trial and a hearing on a motion to enforce a settlement."

Solutions had repeatedly contacted Con Am Management and had supplied labor to the company, in violation of the Stipulated Injunction.

### c. *The trial court's statement of decision*

On August 11, 2010, the trial court issued a statement of decision. With respect to all 11 counts, the trial court determined that Wanke had established three of the four elements necessary to prove that defendants were in contempt of the Stipulated Injunction. Specifically, the trial court determined that defendants had knowledge of the Stipulated Injunction, that they had the ability to comply with its terms, and that they had willfully disobeyed it.[7] However, the court concluded that Wanke had failed to establish the "existence of a lawful order," which is required before a party may be held in contempt of that order.

The trial court reached this conclusion based on its determination that the Stipulated Injunction was invalid to the extent that it prohibited defendants from soliciting an entity merely because the entity appeared on the customer list attached to the Stipulated Injunction. In making this determination, the court began by reviewing California law pertaining to the enforceability of noncompetition agreements, including Business and Professions Code section 16600.[8] The court summarized this law by noting, "[C]ourts have repeatedly held a former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business *if the employee is utilizing trade secret information* to solicit those customers." The trial court also recognized that, "Numerous courts have concluded [that] customer lists can qualify for trade secret protection." However, the trial court determined that the Stipulated Injunction was invalid under Business and Professions Code section 16600 because neither the identity of Con Am Management nor its location was a trade secret. The court reasoned as follows: "[H]ad [Wanke] prevailed at trial [in the underlying trade secret action], [Wanke] would not have been entitled to an injunction which protected as its exclusive property the identity or location of [Con Am Management]. This is so because anyone, including Keck, could easily identify Con Am as a potential customer. The fact that defendants agreed to the [Stipulated Injunction] does not change the result, given the fact that [Wanke] now seeks to have the court invoke its contempt powers. The court must conclude that the [Stipulated Injunction], to the extent it would protect as a trade secret the mere identity of [Con Am Management] (and forbid any contact with [Con Am Management] for 18 months or 5 years, depending on who initiated the contact) is overbroad and infirm."

---

[7] These elements are not at issue in either the appeals or writ petition.

[8] Business and Professions Code section 16600 states: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

On this basis, the court concluded that defendants could not be convicted of contempt and that they were "acquitted" on all 11 counts.

After reaching this conclusion, the court proceeded to rule that the Stipulated Injunction *could* be applied lawfully under the following circumstances: "So as to avoid striking down the entire [Stipulated] Injunction (which would naturally have the effect of unwinding the entire settlement and consigning the parties to further fruitless and expensive litigation) and (hopefully) as a guide to the parties in arranging their affairs in the future, the court holds that the provisions of the [Stipulated] Injunction apply only to jobs undertaken or proposed to be undertaken for Con Am while defendants Keck and/or Bozarth were employed by [Wanke]. . . . Only on these jobs can the defendants be said to be using information they learned while employed at [Wanke] to 'identify customers with particular needs or characteristics' within the meaning of the case law discussed above [addressing the enforceability of noncompetition agreements under California law]. [Citation.]"

With respect to Wanke's motion to enforce the Settlement Agreement, the court ruled that "no liquidated damages may be imposed," because "all eleven of the alleged 'violations' were not in fact violations of the [Stipulated Injunction] as interpreted above by the court." Notwithstanding this conclusion, the trial court ruled that Wanke was entitled to recover attorney fees from defendants in the amount of $17,655 as the prevailing party on the motion to enforce the Settlement Agreement.[9] The court reasoned that "although [Wanke] did not succeed in having the defendants held in contempt and did not succeed in obtaining an award of liquidated damages," Wanke did obtain a "declaratory judgment regarding the scope and enforceability of the [Stipulated Injunction]."

### 2. *The proceedings involving AV Builders: Saratoga West*

In September 2010, Wanke filed a motion to enforce the Settlement Agreement with respect to a different customer/job listed in the Stipulated Injunction, AV Builders: Saratoga West.[10] In its motion, Wanke quoted the trial court's statement of decision in which the court held " 'that the provisions of the [Stipulated] Injunction apply only to jobs undertaken or proposed to be undertaken . . . while defendants Keck and/or Bozarth were

---

[9] The trial court ruled that Wanke was not entitled to recover $13,871 in attorney fees that Wanke had requested for its prosecution of the contempt proceeding. Wanke has not challenged that ruling in this court. In its briefing on appeal, Wanke urges us to "affirm the trial court's order[] . . . awarding [Wanke] its attorney[] fees related to the [Con Am Management] hearing."

[10] AV Builders is a contractor. Saratoga West is the name of a multifamily housing development.

employed by [Wanke].' " Wanke contended that "[e]ven under th[is] highly restrictive reading of the [Stipulated] Injunction," defendants had violated the Stipulated Injunction by performing work for AV Builders on the Saratoga West project. Wanke attached a declaration and supporting exhibits to its motion.

Defendants filed an opposition to the motion in which they argued, "[o]nly when the Defendants misuse trade secret information, may Defendants be considered in breach of the [Settlement] [A]greement." Defendants further contended that "[n]either Keck nor Bozarth utilized any information gained from their previous employment to unfairly compete with [Wanke] on the 2009 Saratoga West project." Defendants supported their opposition with a declaration from Keck in which he discussed the circumstances leading to AV Builders awarding WP Solutions a job on the Saratoga West project.

The trial court issued a tentative order granting Wanke's motion. In its order, the court recited its August 11 decision that the Stipulated Injunction applied to "jobs undertaken or proposed to be undertaken . . . while defendants Keck and/or Bozarth were employed by [Wanke]." The court proceeded to find that defendants had violated the Stipulated Injunction, as so interpreted. The court ordered defendants to pay Wanke $58,615, including $50,000 in liquidated damages and $8,615 in attorney fees. After a hearing the following day, the court confirmed its tentative order.

### 3. *The trial court's final orders*

On October 1, 2010, the trial court entered two orders. With respect to the contempt proceedings and Wanke's motion to enforce the Settlement Agreement as to Con Am Management, the court incorporated its August 11 statement of decision and ordered defendants to pay Wanke $17,655 in attorney fees. With respect to Wanke's motion to enforce the Settlement Agreement as to AV Builders: Saratoga West, the court ordered defendants to pay Wanke $58,615 in liquidated damages and attorney fees.

### D. *Proceedings in this court*

### 1. . *Keck and WP Solutions's appeal*

Keck and WP Solutions filed an appeal from the trial court's two October 1 orders. With respect to the trial court's order concerning Wanke's motion to enforce the Settlement Agreement as it pertained to Con Am Management, Keck and WP Solutions contend that the court erred in awarding Wanke attorney fees as a prevailing party. Keck and WP Solutions maintain that Wanke was not a prevailing party because the trial court determined both that

the Stipulated Injunction was invalid, and that Keck and WP Solutions could not be found to be in contempt of the Stipulated Injunction or to have violated the Settlement Agreement.

With respect to the trial court's order concerning Wanke's motion to enforce the Settlement Agreement as it pertains to AV Builders: Saratoga West, Keck and WP Solutions contend that the trial court erred in concluding that they violated the Stipulated Injunction and breached the Settlement Agreement by performing work for AV Builders. Specifically, Keck and WP Solutions maintain that the court erred in concluding that they could be found to have violated the Stipulated Injunction and that they were thus liable for liquidated damages, in the absence of evidence that they had misappropriated trade secrets or committed some other independently tortious conduct constituting unfair competition in performing the work.

### 2. *Wanke's cross-appeal*

Wanke filed a cross-appeal with respect to the trial court's October 1 order denying its motion to enforce the Settlement Agreement with respect to defendants' having performed work for Con Am Management. In its cross-appeal, Wanke requests that this court "reverse the order of the trial court invalidating the [Stipulated Injunction]" and direct the trial court to "enforc[e] the . . . [S]ettlement [A]greement with respect to [Con Am Management]."

### 3. *Wanke's writ petition*

In addition to filing a cross-appeal, Wanke also filed a petition for writ of mandate challenging the trial court's October 1 order insofar as the court refused to hold Keck and WP Solutions in contempt for violating the Stipulated Injunction.[11] In its petition, Wanke contends that the trial court erred in concluding that the Stipulated Injunction was not a lawful order and acquitting Keck and WP Solutions of contempt on that basis. Wanke requests that we annul the trial court's order discharging the OSC for contempt, and direct the trial court to hold Keck and WP Solutions in contempt.[12]

---

[11] An order discharging an OSC for contempt is not appealable. (See Code Civ. Proc., § 904.1 [specifying the types of judgments and orders from which an appeal may be taken]; *John Breuner Co. v. Bryant* (1951) 36 Cal.2d 877, 878 [229 P.2d 356] ["It is well settled that orders and judgments made in cases of contempt are not appealable, and this rule has been held applicable both where the trial court imposed punishment for contempt and where the alleged contemner was discharged."].) Although Wanke styled its writ petition as a petition for writ of review, this court issued an order deeming the petition a petition for writ of mandate, and stating that the court would consider the petition with the pending appeals.

[12] While the appeals and writ were pending, this court issued an order consolidating the matters for disposition.

## III.

## DISCUSSION

### A. *Wanke's petition for writ of mandate and cross-appeal*

In both its petition for writ of mandate and its cross-appeal, Wanke raises the same contention, i.e., that the trial court erred in determining that the Stipulated Injunction was invalid and unenforceable as violative of Business and Professions Code section 16600.[13] For the reasons explained below, we conclude that the double jeopardy clause of the Fifth Amendment to the federal Constitution (double jeopardy clause) precludes this court from reviewing the trial court's acquittal of Keck and WP Solutions on the contempt charges.[14] However, we address the merits of Wanke's contention in the context of Wanke's appeal of the trial court's denial of its motion to enforce the Settlement Agreement.

> 1. *Wanke's writ petition must be denied because the double jeopardy clause precludes the retrial of Keck and WP Solutions on the contempt charges*

In its writ petition, Wanke asks that we "annul[] the trial court's order discharging the order to show cause re contempt and command[] the trial court to enter its judgment holding [Keck and WP Solutions] in contempt for violation of the [Stipulated Injunction]." We conclude that the double jeopardy clause precludes this court from affording such relief.

> a. *Governing law*

■ "The double jeopardy clause[] of the Fifth Amendment to the United States Constitution . . . provide[s] that a person may not be twice placed 'in jeopardy' for the 'same offense.' " (*People v. Anderson* (2009) 47 Cal.4th 92, 103 [97 Cal.Rptr.3d 77, 211 P.3d 584].) " 'The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal.' [Citation.]" (*Id.* at p. 104.) The United States Supreme Court has also "long held that the Double Jeopardy Clause of the Fifth Amendment prohibits reexamination of a court-decreed acquittal to the same extent it

---

[13] In their informal response, Keck and WP Solutions acknowledge that "the issue[] embraced in both the writ petition and the appeal and cross appeal [is] essentially identical: whether, and to what extent, enforcement of the parties [S]ettlement [A]greement and [Stipulated] [I]njunction violates [Business and Professions Code] section 16600." (Italics & boldface omitted.)

[14] In response to our invitation, the parties have filed supplemental letter briefs addressing the potential applicability of the double jeopardy clause in this case.

prohibits reexamination of an acquittal by jury verdict." (*Smith v. Massachusetts* (2005) 543 U.S. 462, 467 [160 L.Ed.2d 914, 125 S.Ct. 1129] (*Smith*).) "This is so whether the judge's ruling of acquittal comes in a bench trial or . . . in a trial by jury." (*Ibid.*)

■ The double jeopardy clause applies to "nonsummary criminal contempt prosecutions . . . ." (*United States v. Dixon* (1993) 509 U.S. 688, 696 [125 L.Ed.2d 556, 113 S.Ct. 2849] (*Dixon*); accord, *Colombo v. New York* (1972) 405 U.S. 9, 10–11 [30 L.Ed.2d 762, 92 S.Ct. 756].) The *Dixon* court explained, "We have held that constitutional protections for criminal defendants other than the double jeopardy provision apply in nonsummary criminal contempt prosecutions just as they do in other criminal prosecutions. [Citations.] We think it obvious, and today hold, that the protection of the Double Jeopardy Clause likewise attaches." (*Dixon, supra,* at p. 696.)[15]

Although the *Dixon* court did not expressly describe the difference between *nonsummary* and *summary* contempt proceedings, the distinction, generally, is that, "contempts committed in the view of the court may be punished instantly [as summary contempts] but contempts committed outside the view of the sentencing judge are 'nonsummary contempts' to which due process requirements apply."[16] (*Sassower v. Sheriff of Westchester County* (2d Cir. 1987) 824 F.2d 184, 188; see *Mine Workers v. Bagwell* (1994) 512 U.S. 821, 827, fn. 2 [129 L.Ed.2d 642, 114 S.Ct. 2552] ["Direct contempts that occur in the court's presence may be immediately adjudged and sanctioned summarily . . . ."]; *Arthur v. Superior Court* (1965) 62 Cal.2d 404, 407 [42 Cal.Rptr. 441, 398 P.2d 777] ["Contempt committed in the immediate view and presence of the court, known as direct contempt, may be treated summarily."].)

■ With respect to the distinction between *civil* and *criminal* contempt, generally speaking, "a contempt sanction is considered civil if it 'is remedial, and for the benefit of the complainant.' " (*Mine Workers v. Bagwell, supra,* 512 U.S. at p. 827.) In contrast, " 'it is . . . criminal contempt [if] the

---

[15] California courts have long since recognized the applicability of the double jeopardy clause in the contempt context. (*In re Marriage of Rice & Eaton* (2012) 204 Cal.App.4th 1073, 1081 [139 Cal.Rptr.3d 518] ["An alleged contemner also is protected by the doctrine of double jeopardy."]; *In re B.S.* (2009) 172 Cal.App.4th 183, 192 [90 Cal.Rptr.3d 810] ["father could not be criminally prosecuted twice, for contempt or otherwise . . ." because to do so would violate double jeopardy clause of federal Const.]; *People v. Lombardo* (1975) 50 Cal.App.3d 849, 853 [123 Cal.Rptr. 755] ["We . . . conclude that the contempt order invokes the jeopardy provision of the Fifth Amendment held applicable to the states through the Fourteenth Amendment of the United States Constitution . . . ."].)

[16] Justice White offered this formulation of a summary contempt in his concurring and dissenting opinion in *Dixon*: "[A summary contempt is] contempt for acts occurring in the courtroom and interfering with the orderly conduct of business." (*Dixon, supra,* 509 U.S. at p. 723, fn. 1 (conc. & dis. opn. of White, J.).)

sentence is punitive, to vindicate the authority of the court.' " (*Id.* at p. 828.) In *In re Nolan W.* (2009) 45 Cal.4th 1217, 1236–1237 [91 Cal.Rptr.3d 140, 203 P.3d 454] (*Nolan W.*), the California Supreme Court described "the distinctions long recognized between civil and criminal contempt." " 'Where the primary object of contempt proceedings is to protect the rights of litigants, the proceedings are regarded as civil in character. On the other hand, where the object of the proceedings is to vindicate the dignity or authority of the court, they are regarded as criminal in character even though they arise from, or are ancillary to, a civil action. [Citation.]' [Citation.] Civil contempt is a forward-looking remedy imposed to coerce compliance with a lawful order of the court. [Citation.] Civil contemners hold the key to the jail cell in their own pocket, and can secure their release at any time by following the court's order. ([Citation]; *Morelli*[ *v. Superior Court* (1969) 1 Cal.3d 328, 332 [82 Cal.Rptr. 375, 461 P.2d 655]] [basis for civil contempt is 'the omission to perform an act which is still within the person's power to perform']; [citation].) Because the confinement imposed for civil contempt is conditional in nature, based on continuing conduct, the length of incarceration is indefinite, depending 'entirely upon the contemner's continued defiance.' [Citation.] On the other hand, so long as specific procedures are observed to safeguard due process, criminal contempt may be used to punish *past* conduct in violation of a court order. [Citations.] The object of such proceedings 'is to vindicate the dignity or authority of the court.' [Citation.]" (*Ibid.*)

### b. *Application*

In order to determine whether the trial court's ruling stating that Keck and WP Solutions were "acquitted" of the contempt charges in this case precludes further proceedings under the double jeopardy clause in light of the case law cited above, we must determine whether the contempt proceedings in this case were both nonsummary and criminal in nature. (*Dixon, supra,* 509 U.S. at p. 696.)

It is clear that the proceeding in the trial court was a *nonsummary* contempt proceeding. The alleged contempts (i.e., violations of the Stipulated Injunction) did not take place in the trial court's presence, and they were adjudicated in a trial, not in a summary fashion. For the reasons that follow, we also conclude that the proceeding in the trial court was a *criminal* contempt proceeding.

In its brief in support of its application for an OSC, Wanke requested that the court hold Keck and WP Solutions in contempt for "violating the Court's Order [(i.e., Stipulated Injunction)]." At the contempt trial, when the trial court asked what "sentence" Wanke was seeking for Keck and WP Solutions, Wanke's counsel responded that Wanke was requesting that Keck and WP

Solutions pay a fine to the court of $1,000 per violation of the Stipulated Injunction, as provided for by statute. (See Code Civ. Proc., § 1218, subd. (a).) The object of the proceeding was thus to "punish *past* conduct in violation of a court order." (*Nolan W., supra*, 45 Cal.4th at p. 1237.) Wanke did not seek any "forward-looking remedy imposed to coerce compliance with a lawful order of the court," as would be the case in civil contempt proceedings. (*Id.* at p. 1236.)

Further, the trial court clearly regarded the proceedings as criminal in nature, as demonstrated by the court's statement of decision, in which the court stated, "a criminal contempt must be proven beyond a reasonable doubt," and noted that the purpose of a contempt proceeding is to "uphold the dignity of the court's orders." (See *Nolan W., supra*, 45 Cal.4th at p. 1236 [" 'where the object of the proceedings is to vindicate the dignity or authority of the court, they are regarded as criminal in character even though they arise from, or are ancillary to, a civil action' "].) The trial court also clearly and expressly stated that Keck and WP Solutions were "acquitted" of all of the contempt changes.[17]

In its supplemental brief, Wanke suggests that the double jeopardy clause does not apply to the contempt proceeding in this case because the government did not prosecute the action, and the purpose of the double jeopardy clause is to curb abuse of *governmental* authority in legal proceedings. While we have given this contention careful consideration, and we acknowledge that the law in this area is not entirely clear, we reject Wanke's argument under the authority of the United States Supreme Court's holding in *Dixon*. In *Dixon*, a private party prosecuted one of the two contempt proceedings at issue in that case, both of which preceded a criminal prosecution.[18] (See *Dixon, supra*, 509 U.S. at p. 692 ["Counsel for Ana Foster and her mother

---

[17] In its supplemental brief, Wanke maintains that the proceeding below was one for *civil* contempt because it instituted the proceedings pursuant to Code of Civil Procedure section 1209, and states that it is unaware of any case in which a court has held that the double jeopardy clause applies to *civil* contempt proceedings. It is well established that *criminal* contempt proceedings may be brought under Code of Civil Procedure section 1209 et seq., which provide for penalties including fines and imprisonment (Code Civ. Proc., § 1218). (See *People v. Gonzalez* (1996) 12 Cal.4th 804, 816 [50 Cal.Rptr.2d 74, 910 P.2d 1366] (*Gonzalez*) [noting that violation of a valid order may be punished pursuant to an action filed pursuant to Code Civ. Proc., § 1209, and stating that "[b]ecause of the potential punishment, this type of proceeding is considered quasi-criminal . . ."]; *Nolan W., supra*, 45 Cal.4th at p. 1237 [citing Code Civ. Proc., § 1209 and stating, "criminal contempt may be used to punish past conduct in violation of a court order" (italics omitted)].) It is also clear that the law governing whether a contempt proceeding is civil or criminal is that described in the text, and that application of that law to this case demonstrates that the proceeding below was one for *criminal* contempt.

[18] *Dixon* involved two consolidated cases, one of which involved Michael Foster. Michael Foster's contempt proceeding arose from his alleged violation of a civil protection order that prohibited Foster from taking certain abusive actions against his wife, Ana Foster. (*Dixon, supra*, 509 U.S. at pp. 691–692.)

prosecuted the action; the United States was not represented at trial . . . ."].) Notwithstanding that a private party had prosecuted the contempt proceeding, the court held that jeopardy attached to that proceeding. In addition, the *Dixon* court expressly described Michael Foster's contempt proceeding as one for "criminal contempt" (*id.* at p. 693), and did *not* limit its broad holding that the protection of the double jeopardy clause attaches to "nonsummary criminal contempt prosecutions" (509 U.S. at p. 696) to those *prosecuted by the government.*

One could reasonably argue that *Dixon should be* limited to nonsummary criminal contempt proceedings that are prosecuted by the government, or on its behalf, and that a contempt trial under Civil Code of Procedure section 1209 is not such a proceeding.[19] In his separate opinion in *Dixon*, Justice White appeared to suggest that the contempt proceeding involving Michael Foster had been brought on behalf of the government. (See *Dixon, supra,* 509 U.S. at p. 727, fn. 3 (conc. & dis. opn. of White, J.) ["That the contempt proceeding was brought and prosecuted by a private party in *Foster* is immaterial. For 'private attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated.[20] As we said in *Gompers* [*v. Bucks Stove & Range Co.* (1911) 221 U.S. 418, 445] [55 L.Ed. 797, 31 S.Ct. 492], criminal

---

[19] The California Supreme Court has held that "contempt proceedings instituted under the provisions of the Code of Civil Procedure of this state are not strictly criminal actions but are special proceedings of a criminal character, and as such they are not within, nor governed by, the requirements of section 20, article VI of the Constitution of this state. They are not thereby required to be brought in the name of the people of the state, nor prosecuted by their authority." (*Bridges v. Superior Court* (1939) 14 Cal.2d 464, 477 [94 P.2d 983] (*Bridges*), revd. on other grounds *sub nom. Bridges v. California* (1941) 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190]; see *Safer v. Superior Court* (1975) 15 Cal.3d 230, 235 [124 Cal.Rptr. 174, 540 P.2d 14] [concluding district attorney could not intervene in civil litigation to prosecute criminal contempt proceeding under Code Civ. Proc., § 1209].)

The California Supreme Court's opinion in *Bridges*, which the court issued in 1939, was decided long before both the United States Supreme Court issued its 1993 decision in *Dixon*, and before much of the United States Supreme Court's jurisprudence concerning constitutional protections applicable to criminal contempt proceedings existed. (See, e.g., *Bloom v. Illinois* (1968) 391 U.S. 194 [20 L.Ed.2d 522, 88 S.Ct. 1477] [holding that a criminal contempt prosecution is a criminal prosecution for the purposes of the 6th Amend. to the federal Const.].) In our view, the validity of the *Bridges* court's holding that a private party may prosecute a criminal contempt proceeding under Code of Civil Procedure section 1209 *on its own behalf* presents a serious constitutional question. (See *Robertson v. United States ex rel. Watson* (2010) 560 U.S. ___, ___ [176 L.Ed.2d 1024, 130 S.Ct. 2184, 2185] (dis. opn. of Roberts, C. J. from dismissal of writ of cert.) ["The terrifying force of the criminal justice system may only be brought to bear against an individual by society as a whole, through a prosecution brought on behalf of the government."].) However, we need not decide this issue in light of our conclusion that *Dixon* applies to all criminal contempt proceedings, including those prosecuted by a private party.

[20] Notwithstanding Justice White's suggestion that Foster's counsel had been appointed to represent the United States, there is nothing in Justice Scalia's opinion for the *Dixon* court that

contempt proceedings arising out of civil litigation "are between the public and the defendant . . . ." [Citation.]' [Citation]"]; see also *Robertson v. United States ex rel. Watson, supra,* 560 U.S. at p. ___ [130 S.Ct. at p. 2186] (dis. opn. of Roberts, C. J. from dismissal of writ of cert.) [explaining that because *Dixon* involved "a private party's prosecution for criminal contempt," "the only possible way the Government's *second* prosecution could have offended the Double Jeopardy Clause is if the Court understood the criminal contempt prosecution to be the Government's first prosecution—i.e., one brought on behalf of the Government" (italics omitted)].) However, there is nothing in Justice Scalia's opinion for the *Dixon* court that suggests that Foster's prosecution had been brought on behalf of the United States, or that such a fact was critical to the court's holding that the double jeopardy "provision appl[ies] in nonsummary criminal contempt prosecutions . . . ." (*Dixon, supra,* 509 U.S. at p. 696.)

In addition, the argument that nonsummary criminal contempt proceedings, whether prosecuted by the state or by a private party, are—for lack of a more precise description—sufficiently criminal in nature such that the double jeopardy clause applies, is worthy of serious consideration. In any event, there is no language in *Dixon* that would support limiting the application of the double jeopardy clause to nonsummary criminal contempt proceedings *prosecuted either by the government or on its behalf.* Because we are bound by *Dixon,* we conclude that the double jeopardy clause applies to the criminal contempt proceeding in this case, notwithstanding that it was prosecuted by Wanke.

Wanke also contends that even if the double jeopardy clause applies to the contempt proceeding in the trial court, appellate review is permitted because Keck and WP Solutions "were not 'acquitted' as that term is applied in double jeopardy analysis."

■ "As a general rule, the elements of contempt include (1) a valid order, (2) knowledge of the order, (3) ability to comply with the order, and (4) willful failure to comply with the order. [Citations.]" (*In re Ivey* (2000) 85 Cal.App.4th 793, 798 [102 Cal.Rptr.2d 447].) The trial court found that Keck and WP Solutions "cannot be convicted of contempt" because the Stipulated Injunction was invalid. After making this finding, the court stated that Keck and WP Solutions "are acquitted, and they are discharged on all 11 counts."

■ Wanke contends that despite the trial court's use of the term "acquitted," that court's action did not amount to an acquittal for purposes of the

indicates as much and the lower court decision in *Dixon* stated, "[t]he United States was not a party . . ." to the contempt proceeding. (*United States v. Dixon* (D.C. 1991) 598 A.2d 724, 726.)

double jeopardy clause because "[t]he reliance by [Keck and WP Solutions] on a legal, as opposed to a factual, defense means that double jeopardy cannot apply to this case . . . ." Wanke's contention is contrary to well-established authority pertaining to application of the double jeopardy clause. Case law makes it clear that an acquittal bars further proceedings on the charge or charges at issue, even where the acquittal is premised on a trial court's error of law. (See *Smith, supra*, 543 U.S. at p. 473 ["[A]ny contention that the Double Jeopardy Clause must itself . . . leave open a way of correcting legal errors is at odds with the well established rule that the bar will attach to a[n] . . . acquittal that is patently wrong in law. [Citations.]"].)

For example, in *Arizona v. Rumsey* (1984) 467 U.S. 203, 211 [81 L.Ed.2d 164, 104 S.Ct. 2305] (*Rumsey*), "a trial judge sitting as a sentencer in a death-penalty proceeding entered an 'acquittal,' *i. e.*, a life sentence, based on an erroneous construction of the law governing a particular aggravating circumstance. The Court held that the Double Jeopardy Clause barred a second sentencing hearing." (*Smalis v. Pennsylvania* (1986) 476 U.S. 140, 145, fn. 8 [90 L.Ed.2d 116, 106 S.Ct. 1745] (*Smalis*).)

The *Rumsey* court explained: "Reliance on an error of law, however, does not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits. '[The] fact that "the acquittal may result from . . . erroneous interpretations of governing legal principles" . . . affects the accuracy of that determination, but it does not alter its essential character.' " (*Rumsey, supra*, 467 U.S. at p. 211; accord, *Smalis, supra*, 476 U.S. at p. 144, fn. 7 ["The status of the trial court's judgment as an acquittal is not affected by the Commonwealth's allegation that the court 'erred in deciding what degree of recklessness was . . . required to be shown under Pennsylvania's definition of [third-degree] murder.' "].)

Similarly, in *U.S. v. Ogles* (9th Cir. 2006) 440 F.3d 1095 (*Ogles*), an en banc panel of the United States Court of Appeals for the Ninth Circuit unanimously held that the double jeopardy clause applied to bar review of the trial court's granting of a motion for judgment of acquittal premised on an issue of statutory interpretation. The district court in *Ogles* acquitted a defendant of violating 18 United States Code section 922(a)(1)(A) based on the court's "adopt[ing] the reasoning of *United States v. Caldwell*, 49 F.3d 251, 252 (6th Cir. 1995), which held that § 922(a)(1)(A)'s prohibition against dealing in firearms without a license is not violated when the defendant has a federal firearms license, even if he sold firearms away from the licensed premises." (*Ogles, supra*, at p. 1098.) After reviewing United States Supreme Court case law concerning the meaning of an acquittal for purposes of the double jeopardy clause, the *Ogles* court rejected the government's argument that "the district court's decision rested solely on its resolution of a statutory

construction issue . . . ," and therefore, that the district court's ruling was "a purely legal determination unrelated to factual guilt or innocence and . . . not . . . a genuine acquittal." (*Id.* at p. 1103.) The *Ogles* court reasoned:

"In deciding the Rule 29(a) motion [for judgment of acquittal], the district court adopted the Sixth Circuit's interpretation of § 922(a)(1)(A) in *Caldwell* and concluded that the term 'licensed dealer' does not have a geographic component. After adopting this interpretation, the district court determined that a *factual element* of the offense—namely, that Ogles was dealing firearms without a license at the time of the challenged conduct—had not been proven. Notably, the district court stated: 'The Court finds . . . that the defendant was a licensed dealer under the statute at the time the transaction took place. Therefore, the judgment of acquittal is appropriate as to Count [Two] of the indictment.' The judgment here was an acquittal in substance as well as form—a determination that the evidence was insufficient to convict. Whether this determination was ultimately correct or 'egregiously erroneous' is not relevant in evaluating double jeopardy. [Citation.]

"The government suggests that because Ogles did not contest his licensed status, the district court's ruling did not meet the Supreme Court's definition of acquittal—that 'whatever its label, [it] actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.' [Citation.] The Court's double jeopardy decisions do not, however, condition an acquittal under Rule 29(a) on the district court's examination of contested facts. Here, the district court determined that a factual element of the offense had not been proved by the government. What is this if not a 'resolution'?" (*Ogles, supra*, at pp. 1103–1104.)

Similarly, in this case, the trial court determined that the Stipulated Injunction was invalid as drafted. As a consequence, the court found that Wanke had failed to establish a factual element of the offense—the violation of a valid court order. In other words, the trial court concluded that the evidence presented at the contempt proceeding was legally insufficient to find Keck and WP Solutions in contempt. This finding constitutes an acquittal for purposes of the double jeopardy clause. (*Smalis, supra*, 476 U.S. at p. 144 ["What the demurring defendant seeks is a ruling that as a matter of law the State's evidence is insufficient to establish his factual guilt. Our past decisions, which we are not inclined to reconsider at this time, hold that such a ruling is an acquittal under the Double Jeopardy Clause." (fn. omitted)];[21]

---

[21] The *Smalis* court also made clear that *United States v. Scott* (1978) 437 U.S. 82, 91 [57 L.Ed.2d 65, 98 S.Ct. 2187], upon which Wanke relies on appeal, was not to the contrary, by stating "*United States* v. *Scott* does not overturn these precedents; indeed, it plainly indicates that the category of acquittals includes '[judgments] . . . by the court that the evidence is insufficient to convict.' [Citation.]" (*Smalis, supra*, 476 U.S. at p. 144.)

*Ogles, supra,* 440 F.3d at p. 1103 ["As the Supreme Court's unbroken line of decisions makes abundantly clear, the determinative question is whether the district court found the evidence legally insufficient to sustain a conviction."].) Accordingly, as in *Ogles,* the acquittal in this case was one both in "substance as well as form." (*Ibid.*)

Finally, Wanke contends that we may consider the merits of its writ petition because "[e]ven where the double jeopardy clause applies, an exception to the rule exists in situations in which no retrial is necessary." In support of this contention, Wanke cites to cases in which courts have cited an exception to the bar on further proceedings in the wake of an acquittal that applies *when there has been a jury's verdict of guilt* followed by a court's granting of a motion for acquittal. In such a case, reversal of the acquittal leaves in place the jury's verdict and the double jeopardy clause is not a bar to appellate proceedings: "Our cases have made a single exception to the principle that acquittal by judge precludes reexamination of guilt no less than acquittal by jury: When *a jury returns a verdict* of guilty and a trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a prosecution appeal to reinstate the jury verdict of guilty. [Citation.] *But if the prosecution has not yet obtained a conviction,* further proceedings to secure one are impermissible . . . ." (*Smith, supra,* 543 U.S. at p. 467, italics added.) Here, there has been no prior verdict of guilt that this court could direct to be reinstated on remand. This exception thus has no application in this case.

█ Because the double jeopardy clause applies to "nonsummary criminal contempt prosecutions" (*Dixon, supra,* 509 U.S. at p. 696) and the "the Double Jeopardy Clause of the Fifth Amendment prohibits reexamination of a court-decreed acquittal to the same extent it prohibits reexamination of an acquittal by jury verdict" (*Smith, supra,* 543 U.S. at p. 467), the trial court's acquittal of Keck and WP Solutions of criminal contempt charges precludes further proceedings pertaining to those charges. Accordingly, we conclude that we must deny Wanke's writ petition.[22]

2. *The trial court erred in concluding that the Stipulated Injunction is invalid and denying Wanke's motion to enforce the Settlement Agreement as it pertains to Con Am Management*

Notwithstanding our conclusion that we must deny Wanke's writ petition, we may still review Wanke's contention that the trial court erred in determining that the Stipulated Injunction was invalid and unenforceable in the

---

[22] In light of our conclusion, we need not consider Keck and WP Solutions's contention that we should exercise our discretion to deny Wanke's writ petition as untimely.

context of Wanke's cross-appeal of the trial court's denial of its motion to enforce the Settlement Agreement.[23]

### a. *Governing law*

#### i. *A party may successfully defend against the enforcement of an injunction on the ground that the trial court issued the injunction in excess of its jurisdiction*[24]

■ In *Gonzalez, supra,* 12 Cal.4th at page 817, the California Supreme Court stated that it is well established that a party cannot be held in contempt for violating an order that a trial court issued in excess of its jurisdiction: "The rule is well settled in California that a void order cannot be the basis for a valid contempt judgment. We established in *In re Berry* (1968) 68 Cal.2d 137, 147 [65 Cal.Rptr. 273, 436 P.2d 273] (*Berry*), a case involving a misdemeanor contempt prosecution, that *'the violation of an order in excess of the jurisdiction of the issuing court* cannot produce a valid judgment of contempt [citations], and that the "jurisdiction" in question extends beyond mere subject matter or personal jurisdiction . . . .' Rather, ' "any acts which *exceed the defined power of a court* in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of *stare decisis,* are in excess of jurisdiction." ' (*Ibid.*)" (First & second italics added.)

In contrast to orders entered " 'in excess of the jurisdiction of the issuing court' " (*Gonzalez, supra,* 12 Cal.4th at p. 817), which may be challenged collaterally, a party may not defend against enforcement of a court order by contending merely that the order is legally erroneous (see *In re Marriage of Niklas* (1989) 211 Cal.App.3d 28, 35 [258 Cal.Rptr. 921] (*Niklas*) ["A person may refuse to comply with a court order and raise as a defense to the imposition of sanctions that the order was beyond the jurisdiction of the court and therefore invalid, *but may not assert as a defense that the order merely was erroneous.*" (italics added)]; *Signal Oil & Gas Co. v. Ashland Oil & Refining Co.* (1958) 49 Cal.2d 764, 776, fn. 6 [322 P.2d 1] (*Signal Oil*) [" 'An injunction duly issuing out of a court of general jurisdiction with equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within its jurisdiction, must be obeyed by them

---

[23] It is well established that an order denying a motion to enforce a settlement is appealable as a final judgment. (E.g., *Critzer v. Enos* (2010) 187 Cal.App.4th 1242, 1251 [115 Cal.Rptr.3d 203]; *Hines v. Lukes* (2008) 167 Cal.App.4th 1174, 1183 [84 Cal.Rptr.3d 689].)

[24] Since Wanke has not argued otherwise, we assume for purposes of this decision that, as with contempt proceedings, a party may defend against a motion to enforce a settlement agreement based on a purported violation of an injunction on the ground the injunction was issued in excess of the trial court's jurisdiction, and is therefore invalid.

*however erroneous the action of the court may be . . . .'* " (italics added)]; accord, *Gonzalez, supra*, 12 Cal.4th at p. 823 [*"An erroneous order, however, is not necessarily an order in excess of the issuing court's jurisdiction*, as an order that is unconstitutional on its face would be." (italics added)]).

In *Berry, supra*, 68 Cal.2d at page 150, the petitioner violated a temporary restraining order that was "void on its face." The *Berry* court concluded that the petitioner could not be charged with criminal contempt based on the violation because "the violation of an order in excess of the jurisdiction of the issuing court cannot produce a valid judgment of contempt . . . ." (*Id.* at p. 147; see *ibid.* ["a temporary restraining order constitutionally void on its face is issued in excess of jurisdiction and cannot sustain a contempt judgment based upon its violation"], citing *Fortenbury v. Superior Court* (1940) 16 Cal.2d 405 [106 P.2d 411].)

In reaching this conclusion, the *Berry* court distinguished its prior decision in *Signal Oil, supra*, 49 Cal.2d 764 in which the court sustained the validity of a temporary restraining order based upon an agreement later determined to be void (*Signal Oil, supra*, at pp. 775–778). The *Berry* court explained that *Signal Oil* was not contrary to its holding in the present case because the invalidity of the order at issue in *Signal Oil* was not apparent on the face of the order: "The case of *Signal Oil* . . . is clearly in harmony with the principles above expressed. There the superior court had issued a temporary restraining order enjoining acts in violation of a certain agreement, which acts were nevertheless undertaken. Subsequently the Supreme Court of Delaware held that the agreement was void. In the meantime the superior court had issued a preliminary injunction enjoining the parties from giving any effect to the acts performed in violation of the temporary restraining order and from undertaking future acts in violation of the agreement. We held, on appeal from the order granting the preliminary injunction, that such injunction should be vacated insofar as it purported to enforce future compliance with the void agreement, but that it should be sustained insofar as it forbade recognition of the acts undertaken in violation of the temporary restraining order. In answer to the contention that the court lacked 'jurisdiction' to issue a temporary restraining order enforcing compliance with a void agreement, and that acts undertaken in violation of that order should therefore be given recognition, we concluded that the order suffered from no jurisdictional defect because the invalidity of the agreement did not appear upon the face of the order." (*Berry, supra*, 68 Cal.2d at pp. 147–148.)

The *Berry* court further noted that the *"Signal Oil* case might be considered as holding that a temporary restraining order issued on the basis of an error of law of less than constitutional stature is *not* issued in excess of jurisdiction . . . ." (*Berry, supra*, 68 Cal.2d at p. 148, italics added & omitted;

see *Signal Oil, supra,* 49 Cal.2d at p. 776 ["At the time the orders in this case were issued, the court had jurisdiction over the parties and the subject matter, there was no claim that the procedural requirements of the injunction statute had not been met, and there was at least a prima facie showing of facts which would sustain the court's orders. Under the circumstances, these orders, although subsequently determined to be erroneous, were not void." (fn. omitted)]; see also *Gonzalez, supra,* 12 Cal.4th at p. 823 ["We acknowledged in *Berry* that *Signal Oil* held that an injunctive order enforcing an invalid contract, the invalidity of which is not apparent on its face, is not an injunction issued 'in excess of jurisdiction.' [Citation.]"].)

 ii. *The enforceability of an injunction that precludes a company's former employee from soliciting the company's customers*

██ "[C]ourts have repeatedly held a former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business *if the employee is utilizing trade secret information to solicit those customers.* (See *American Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622, 634 [262 Cal.Rptr. 92] ['in the absence of a protectable trade secret, the right to compete fairly outweighs the employer's right to protect [customers] against competition from former employees']; accord, *Aetna Bldg. Maintenance Co. v. West* (1952) 39 Cal.2d 198, 204–206 [246 P.2d 11].)" (*The Retirement Group v. Galante* (2009) 176 Cal.App.4th 1226, 1237 [98 Cal.Rptr.3d 585] (*Retirement Group*), some italics added.)[25] In *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1521–1527 [66 Cal.Rptr.2d 731] (*Morlife*), the court concluded that there was substantial evidence to support the trial court's findings that two former employees had misappropriated the trade secrets of their former employer (Morlife) by using confidential customer lists to solicit Morlife's customers after leaving Morlife's employ. The *Morlife* court outlined the factors that a court should consider in determining whether an employer's customer list may be protected as a trade secret, stating:

██ "[C]ourts are reluctant to protect customer lists to the extent they embody information which is 'readily ascertainable' through public sources, such as business directories. [Citation.] On the other hand, where the employer has expended time and effort identifying customers with particular

[25] Civil Code section 3426.1, subdivision (d), a provision contained in California's version of the Uniform Trade Secrets Act (UTSA; Civ. Code, § 3426 et seq.), defines the term "trade secret" as follows: "(d) 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers. [Citations.] As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret. [Citation.]

"The requirement that a customer list must have economic value to qualify as a trade secret has been interpreted to mean that the secrecy of this information provides a business with a 'substantial business advantage.' [Citation.] In this respect, a customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested. [Citation.] Its use enables the former employee 'to solicit both more selectively and more effectively.' [Citation.]" (*Morelife, supra*, 56 Cal.App.4th at pp. 1521–1522.)

■ Applying these factors, the *Morlife* court concluded that there was substantial evidence to support the trial court's finding that the employer's customer list in that case constituted a protectable trade secret. (*Morlife, supra*, 56 Cal.App.4th at pp. 1522–1523.) The *Morlife* court also concluded that the trial court had not erred in enjoining the former employees from " '*soliciting* any business from *any* entity that did business with Morlife before [the former employees] stopped working there, *provided they obtained knowledge about the customer during the course of their employment at Morlife.*' " (*Id.* at pp. 1527–1528, third italics added.) In reaching this conclusion, the *Morlife* court reasoned in part, "In view of the clearly established violation of the UTSA, the injunction correctly draws the line, and leaves [the former employees' new company] free to solicit customers whose identities are not the trade secrets of Morlife." (*Id.* at p. 1528; see *Retirement Group, supra*, 176 Cal.App.4th at p. 1238 ["a court may enjoin *tortious* conduct (as violative of either the [UTSA] and/or the unfair competition law) by banning the former employee from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer"]; accord, *Thompson v. Impaxx, Inc.* (2003) 113 Cal.App.4th 1425, 1429 [7 Cal.Rptr.3d 427] (*Thompson*) [" 'Antisolicitation covenants are void as unlawful business restraints *except where their enforcement is necessary to protect trade secrets.*' " (italics added)].)

### iii. Noncompetition agreements that do not protect a company's trade secrets are generally unenforceable

Business and Professions Code section 16600 provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

In *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 948 [81 Cal.Rptr.3d 282, 189 P.3d 285] (*Edwards*), the Supreme Court considered whether Business and Professions Code section 16600 rendered invalid portions of a noncompetition agreement that, among other restrictions, precluded an employee from soliciting the clients of his former employer for one year after the termination of his employment with the employer. In analyzing this issue, the *Edwards* court expressly stated that it was not "address[ing] the applicability of the so-called trade secret exception to section 16600, as Edwards does not dispute that portion of his agreement[26] or contend that the provision of the noncompetition agreement prohibiting him from recruiting Andersen's employees violated section 16600." (*Edwards, supra*, at p. 946, fn. 4.)

In holding that the noncompetition agreement at issue in that case was invalid, the *Edwards* court stated: "We conclude that Andersen's noncompetition agreement was invalid. As the Court of Appeal observed, 'The first challenged clause prohibited Edwards, for an 18-month period, from performing professional services of the type he had provided while at Andersen, for any client on whose account he had worked during 18 months prior to his termination. The second challenged clause prohibited Edwards, for a year after termination, from 'soliciting,' defined by the agreement as providing professional services to any client of Andersen's Los Angeles office.' The agreement restricted Edwards from performing work for Andersen's Los Angeles clients and therefore restricted his ability to practice his accounting profession. (See *Thompson v. Impaxx, Inc.*[, *supra*,] 113 Cal.App.4th [at p.] 1429 . . . [distinguishing 'trade-route' and solicitation cases that protect trade secrets or confidential proprietary information].)" (*Edwards, supra*, 44 Cal.4th at p. 948.)

---

[26] Although the *Edwards* court stated that the employee had not disputed "that portion of his agreement" related to the trade secret exception, the opinion did not further describe the nature of this portion of the employee's noncompetition agreement. (*Edwards, supra*, 44 Cal.4th at p. 946, fn. 4.)

 Thus, under *Edwards*, Business and Professions Code section 16600 generally[27] prohibits the enforcement of a nonsolicitation agreement in all cases in which the trade secret exception does *not* apply.

### b. *Application*

 Wanke contends that the trial court erred in concluding that the Stipulated Injunction is invalid, and denying its motion to enforce the Settlement Agreement on that ground. We agree. As discussed in part III.A.2.a.i., *ante*, a party may successfully defend against the enforcement of an injunction on the ground that the injunction is invalid only in the narrow circumstance in which the party can demonstrate that the injunction was beyond the trial court's jurisdiction to issue in the first instance. (*Gonzalez, supra*, 12 Cal.4th at p. 817.) For the following reasons, it is clear that Keck and WP Solutions made no such showing.

It is undisputed that at the time the trial court issued the Stipulated Injunction, the court had personal and subject matter jurisdiction over the parties. It is also undisputed that at the time the court entered the Stipulated Injunction, Wanke had filed a lawsuit in which it contended that Keck and WP Solutions had misappropriated its trade secrets. Wanke requested that the court issue an order enjoining Keck and WP Solutions from soliciting its customers. The court entered the Stipulated Injunction as part of a final resolution of the case. Each of these facts supports the validity of the Stipulated Injunction. (See *Signal Oil, supra*, 49 Cal.2d at p. 776 [concluding order was not issued in excess of its jurisdiction where "court had jurisdiction over the parties and the subject matter, there was no claim that the procedural requirements of the injunction statute had not been met, and there was at least a prima facie showing of facts which would sustain the court's orders" (fn. omitted)].)

In addition, Keck and WP Solutions do not claim that the Stipulated Injunction was "obtained in an unauthorized manner" (*Davidson v. Superior Court* (1999) 70 Cal.App.4th 514, 529 [82 Cal.Rptr.2d 739]) or in violation of statutory procedures. (Compare with *ibid.* ["the 1987 stipulated order was in excess of the court's jurisdiction because it was not entered in compliance with [Code of Civil Procedures] section 664.6 or some other settlement enforcement mechanism"].) Further, there is nothing on the face of the Stipulated Injunction that indicates that it is unconstitutional or that it violates a statute. (Compare with *Gonzalez, supra*, 12 Cal.4th at p. 823 ["we . . .

---

[27] There are three statutory exceptions to Business and Professions section 16600. (See *id.*, §§ 16601, 16602, 16602.5.) It is undisputed that none of these exceptions apply in this case.

explained in *Berry* the overriding principle that an order unconstitutional on its face *is* in excess of jurisdiction . . ."].)[28]

On the contrary, because the Stipulated Injunction is valid to the extent that it protects Wanke's trade secrets, and one cannot conclude from the *face* of the Stipulated Injunction that it does *not* protect Wanke's trade secrets, the Stipulated Injunction is facially valid. (*Berry, supra,* 68 Cal.2d at p. 148 ["[In *Signal Oil*] we concluded that the order suffered from no jurisdictional defect because the invalidity of the agreement did not appear upon the face of the order."].) Indeed, by repeatedly arguing that there is *substantial evidence* to support the trial court's *factual* finding that the customer list attached to the Stipulated Injunction is not a trade secret, Keck and WP Solutions implicitly concede that the Stipulated Injunction *is* facially valid. (Cf. *Thompson, supra,* 113 Cal.App.4th at p. 1430 ["The issue of whether information constitutes a trade secret is a question of fact."].)[29]

Stated differently, even assuming that Keck and WP Solutions could demonstrate that the trial court erred in issuing the Stipulated Injunction because the customer list attached to the Stipulated Injunction is not a protected trade secret, such a showing would be insufficient to avoid enforcement of the injunction. That is because demonstrating that the trial court *erred* in issuing the injunction would not be sufficient to demonstrate that the court acted in "excess of its jurisdiction" in doing so. (See *Niklas, supra,* 211

---

[28] With respect to the facial validity of the injunction, we emphasize that Keck and WP Solutions do not contend that the so-called trade secret exception to the enforceability of noncompetition agreements referred to by the *Edwards* court is no longer valid. (But see *Dowell v. Biosense Webster, Inc.* (2009) 179 Cal.App.4th 564, 577 [102 Cal.Rptr.3d 1] ["we doubt the continued viability of the common law trade secret exception to covenants not to compete . . ."].) On the contrary, Keck and WP Solutions state in their briefing on appeal, "[Business and Professions Code] section 16600 prohibits employee noncompetition agreements unless the agreement falls within a statutory exception (which does not apply here) or is *necessary to protect the former employer's confidential trade secret information.*" (Italics added.) Further, Keck and WP Solutions make no argument that section 16600 precludes the enforcement of an injunction that is necessary to protect an employer's trade secrets. Rather, Keck and WP Solutions rely on *Morlife* and *Retirement Group* and the cases cited therein, and acknowledge that "an employee is free to 'solicit' the customers of its former employer *so long as the employee does not use confidential or trade secret information* belong[ing] to the former employer to do so." (Italics added.) Accordingly, we assume for purposes of this decision that, as Keck and WP Solutions state in their briefing on appeal, "the misuse of trade secret information . . . may be properly enjoined by agreement under [Business and Professions Code] section 16600."

[29] For example, Keck and WP Solutions contend, "[T]he trial court made the threshold factual determination that the customer information which Wanke sought to enjoin was not wrongfully obtained by [Keck and WP Solutions], but was common knowledge. . . . That factual determination was supported by substantial evidence . . . ." With respect to the merits of Keck and WP Solutions's contention, there is no evidence to support the trial court's conclusion that the customer list attached to the Stipulated Injunction is not a trade secret. (See pt. III.A.2.b., *post.*)

Cal.App.3d at p. 35; *Signal Oil, supra,* 49 Cal.2d at p. 776, fn. 6; see also *Gonzalez, supra,* 12 Cal.4th 804, 818–819 [a party may " 'disobey . . . [a court] order and *raise his jurisdictional contentions* when he is sought to be punished for such disobedience' " (italics added & omitted; quoting *Berry, supra,* 68 Cal.2d at pp. 148–149)].)

Our conclusion that Keck and WP Solutions have not demonstrated that the trial court acted in excess of its jurisdiction in issuing the Stipulated Injunction is also supported by fundamental fairness and common sense. Keck and WP Solutions may not stipulate to an injunction that identifies certain customers whom they will not solicit, in order to resolve claims that they misappropriated Wanke's trade secrets, then proceed to violate the Stipulated Injunction and defend against its enforcement by claiming that Wanke's customer list is not a trade secret.

Further, even assuming that Keck and WP Solutions were permitted to collaterally attack the validity of the Stipulated Injunction, and that they could prove that the customer list attached to the Stipulated Injunction is not a trade secret, they made no such factual showing in this case. Although the trial court appeared to acknowledge in its statement of decision that *Morlife* requires a fact-specific inquiry to determine whether a customer list is a trade secret, the trial court found that the customer list attached to the Stipulated Injunction was not a protected trade secret *in the absence of the submission of any evidence that would support such a conclusion.* While Keck and WP Solutions repeatedly assert in their briefing on appeal that the trial court's factual determination is supported by "substantial evidence," they cite to *no* such evidence in the record. We have thoroughly reviewed the record and conclude that there is in fact no such evidence.

Keck and WP Solutions also appear to contend that, even assuming the customer list attached to the Stipulated Injunction *is* a trade secret, the Stipulated Injunction is nevertheless invalid. Keck and WP Solutions suggest that the Stipulated Injunction is invalid because, rather than prohibiting the *misuse* of Wanke's customer list, the Stipulated Injunction prohibits *any* solicitation of the customers on the list. We are not persuaded. The *Morlife* court upheld an injunction that prohibited a group of former employees from soliciting the business of any entity that had done business with Morlife before the employees left their employment with Morlife if the employees had obtained knowledge of the customer during their employment with Morlife. (*Morlife, supra,* 56 Cal.App.4th at pp. 1527–1528.) Thus, like the Stipulated Injunction, the injunction at issue in *Morlife* did not narrowly restrict the former employees' *misuse* of a customer list. Further, the *Morlife* court upheld the validity of the injunction at issue in that case because it left the former employees "free to solicit customers whose identities are not the

trade secrets of Morlife." (*Id.* at p. 1528.) The same is true with respect to the Stipulated Injunction. In short, since the trial court could not conclude, based on the language of the Stipulated Injunction, that it *does not* protect Wanke's trade secrets the court erred in concluding that the Stipulated Injunction was an unlawful business restraint. (See *Thompson, supra,* 113 Cal.App.4th at p. 1429 [antisolicitation covenants are valid " *'where their enforcement is necessary to protect trade secrets'* " (italics added)].)

Accordingly, we conclude that the trial court erred in denying Wanke's motion to enforce the Settlement Agreement as to Con Am Management.

### B. *Keck and WP Solutions's appeal*

Keck and WP Solutions raise two claims in their appeal, both of which fail in light of our resolution of Wanke's cross-appeal. First, Keck and WP Solutions contend that the trial court erred in awarding Wanke attorney fees as a prevailing party after having determined that the Stipulated Injunction could not be enforced as drafted. This claim fails in light of our conclusion that the trial court erred in determining that the Stipulated Injunction could not be enforced as drafted. Second, Keck and WP Solutions contend that the trial court erred in enforcing the Settlement Agreement with respect to AV Builders: Saratoga West because such a ruling purportedly "flatly contradicted" its ruling with respect to Con Am Management that the Stipulated Injunction could not be enforced as drafted. This claim also fails in light of our conclusion that the trial court erred in determining that the Stipulated Injunction could not be enforced as drafted.

### IV.

### DISPOSITION

Wanke's petition for writ of mandate is denied. Each party is to bear its own costs in connection with the writ proceeding in case No. D058825.

The trial court's order entitled "Order Re OSC Re Contempt and Motion to Enforce Settlement Agreement (Con Am Management)" is reversed with respect to the trial court's denial of Wanke's motion to enforce the Settlement Agreement. The matter is remanded to the trial court with directions to vacate its order and to conduct further proceedings consistent with this opinion, including granting Wanke's motion to enforce the Settlement Agreement as to Con Am Management and determining damages. The trial court shall enter a new order upon the conclusion of the proceedings on remand awarding Wanke the $17,655 in attorney fees previously ordered, as well as any additional attorney fees that the court might reasonably award on remand.

The trial court's order entitled "Order Enforcing Settlement Agreement (AV Builders: Saratoga West)" is affirmed.

Wanke is entitled to recover its costs related to the appeals in case No. D058669.

McConnell, P. J., and Huffman, J., concurred.

A petition for a rehearing was denied October 29, 2012, and the opinion was modified to read as printed above.